UNITED STATES of America,
Plaintiff,

v.

**John Devalier DANIELS, Defendant.**

**Case No. 12–cr–00574–PJH–3**

United States District Court,
N.D. California.

Signed December 2, 2016

---

Brigid Martin, US Attorney's Office, San Francisco, CA, for Plaintiff.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT DANIELS' MOTION TO SUPPRESS**

PHYLLIS J. HAMILTON, United States District Judge

On November 16, 2016, the court held a hearing on the motion of defendant John Devalier Daniels to suppress evidence obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and took the matter under submission. Having considered the relevant authority, the evidence and papers submitted by the parties, and the argument of counsel, the court GRANTS IN PART and DENIES IN PART the motion to suppress for the reasons set forth below.

## I. LEGAL STANDARD

■ The *Miranda* doctrine requires that police must advise a suspect who is in custody of his right to counsel and his right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), a suspect in custody who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." In *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), a plurality of the Supreme Court found that the defendant had initiated further communication by asking police, "What is going to happen to me now?" during a transfer from the police station to jail. Because the question "evinced a willingness and a desire for a generalized discussion about the investigation ... [and] was not merely a necessary inquiry arising out of the incidents of the custodial relationship," the plurality concluded that the *Edwards* rule against police-initiated communications had not been violated. *Id.* See *United States v. Jennings*, 515 F.3d 980, 986 (9th Cir. 2008) (defendant initiated communication about the investiga-

tion when he was transferred from state to federal custody by stating "If this is about the missing serial number, I didn't know that it was missing.").

■■■ Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently. *See Miranda,* 384 U.S. at 475, 86 S.Ct. 1602. A valid waiver of *Miranda* rights depends upon the totality of the circumstances, including whether the "defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Younger,* 398 F.3d 1179, 1185 (9th Cir. 2005). In considering whether *Miranda* rights are knowingly and intelligently waived, the court considers: (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appeared to understand his rights; (4) whether a defendant had the assistance of a translator, if necessary; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system. *United States v. Garibay,* 143 F.3d 534, 538 (9th Cir. 1998). The burden is on the government to prove voluntariness, and there is a presumption against waiver. *Younger,* 398 F.3d at 1186.

## II. DISCUSSION

Daniels moves to suppress on the ground that the police continued questioning him after he invoked his *Miranda* right to counsel two separate times. Doc. no. 164. The government concedes that Daniels was subject to a custodial interrogation and twice invoked his right to counsel but contends that Daniels waived his *Miranda* rights. Daniels' statements while he was held in the holding cell were recorded on an audio/video recording and the parties do not dispute the material facts. Doc. no. 164, Exs. B1, B2. Nor do the parties dispute that Daniels was in custody at the time he made the statements to police. Rather, the legal issues in dispute are whether Daniels invoked his right to counsel, whether he initiated or reinitiated conversation about the murder investigation under *Bradshaw,* and whether he waived his right to have an attorney present during questioning.

Upon review of the audio/video recording from the holding cell on November 12, 2014, the court identifies three distinct intervals of interrogation relevant to the instant motion to suppress: (1) the first series of questions by Sgt. Rosin and Sgt. Milina (3:58 pm–4:24 pm); (2) the questioning by Sgt. Valle and Officer Barocio (4:49 pm–5:35 pm); and (3) the reinitiation of questioning by Sgt. Rosin and Sgt. Milina (6:28 pm–9:29 pm, not continuous).

### A. First Interrogation

The parties agree that Daniels first invoked his right to talk to an attorney at about 3:33 pm, when he was waiting in the holding cell, with the door open, and called out to an unidentified officer, "Excuse me. Can you call an attorney, please.... I don't want to talk to nobody. I just want to talk to an attorney." The officer responded, "OK, I'm not calling nobody for you. You can tell Sgt. Rosin that if you want to." Sgt. Rosin then stepped into the holding cell at 3:34 pm.

Upon entering the holding cell, Sgt. Rosin asked Daniels, "What's up? Are you okay right now? Like, I'm not impressed with how you're behaving right now." Daniels contends that Sgt. Rosin did not acknowledge that Daniels asked for an attorney before engaging him in conversation. The government argues that Daniels did not ask Sgt. Rosin for a lawyer, but initiated the conversation about the investiga-

tion with Sgt. Rosin by asking, "what's going on?" and "am I under arrest for anything?" Opp. (doc. no. 181) at 17. Sgt. Rosin did not ask Daniels questions at that point, about 3:36 pm, but informed Daniels that he was being detained for questioning and that he had not been charged with anything. Sgt. Rosin left the holding cell, while Daniels took a smoke break, and returned with Sgt. Milina at about 3:58 pm. Sgt. Rosin proceeded with the understanding that "I think we talked it out; we're moving forward," and asked Daniels some background questions. Sgt. Rosin did not read Daniels his *Miranda* rights until 4:08 pm, at which point Daniels stated he understood his rights and initialed a document, which the government represents was a written *Miranda* form. Opp. at 4. The parties did not submit a copy of this written form and do not raise an issue as to whether it included a waiver of *Miranda* rights.

After answering questions by Sgt. Rosin and Sgt. Milina, Daniels invoked his right to counsel a second time, at 4:24 pm: "Now, I'm feeling like I need a lawyer. I'd rather talk with a lawyer present." Sgt. Rosin responded, "You have a right to your lawyer.... We can't talk anymore.... You're under arrest for murder." Sgt. Rosin and Sgt. Milina left the holding cell at about 4:26 pm.

 The undisputed evidence shows that Daniels asked an unidentified officer at the Oakland police station for an attorney one minute before Sgt. Rosin entered the holding cell at 3:34 pm, and that Sgt. Rosin did not provide Daniels with *Miranda* warnings until about 4:08 pm, after Daniels had engaged in conversation and answered background questions. Because Daniels made his request for counsel to an officer "within the same investigatory authority" as Sgt. Rosin, the fact that Daniels did not directly ask Sgt. Rosin for an

attorney does not shield Sgt. Rosin from the prohibition against further interrogation under *Miranda* and *Edwards*. *U.S. v. Covington*, 783 F.2d 1052, 1055 (9th Cir. 1985). Daniels' questions about "what's going on" and "am I under arrest" during the course of his interaction with Sgt. Rosin cannot be fairly construed against him as reinitiating a conversation that was actually initiated by Sgt. Rosin.

 Because the conversation initiated by Sgt. Rosin was prohibited under *Edwards*, the fact that Sgt. Rosin formally advised Daniels of his *Miranda* rights in the course of the interrogation before asking him specific questions about the April 2014 shooting on Willow Street does not cure the police-initiated conversation and the failure to determine whether Daniels had waived his earlier-invoked right to an attorney. Daniels was not advised of his *Miranda* rights until after Sgt. Rosin had engaged him in conversation and asked him background questions. "A valid waiver 'cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation' even after being newly advised of his rights." *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999), *as amended* (quoting *Edwards*, 451 U.S. at 484, 101 S.Ct. 1880). In *Alvarez*, the suspect expressed an unequivocal request for an attorney during an interview, having asked (1) "Can I get an attorney right now, man?" (2) "You can have attorney right now?" and (3) "Well, like right now you got one?" but the police continued to question the suspect. The Ninth Circuit held that in light of the suspect's clear invocation of his right to counsel, the police should have discontinued the interview at that point and not subjected the suspect to any further questioning until after he had an opportunity to consult with a lawyer or until he, on his own initiative, resumed the conversation.

185 F.3d at 998. The court in *Alvarez* held that the suspect's subsequent *Miranda* waivers were invalid because the waivers "were in response to further police initiated questioning." *Id.* In granting the state prisoner's habeas petition, the court held that the confessions made during those interviews should have been suppressed under *Edwards* and that the error was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

Sgt. Rosin entered the holding cell about a minute after Daniels asked for an attorney, but did not acknowledge that Daniels had invoked his *Miranda* rights. Rather, Sgt. Rosin initiated dialogue with Daniels by asking "what's up?" and telling Daniels "I'm not impressed with how you're behaving right now." Doc. no. 164, Ex. 1 at 3:34 pm. Although Sgt. Rosin did not flatly ask Daniels "if he wanted to talk about anything," as in *Desire v. Attorney General of California*, 969 F.2d 802, 804 (9th Cir. 1992), Sgt. Rosin initiated the conversation after Daniels invoked his right to counsel, similar to the police-initiated questioning held invalid in *Alvarez*, F.3d at 998. Under the totality of the circumstances, because Daniels did not reinitiate the conversation with police after invoking his right to counsel, the first interrogation by Sgt. Rosin was prohibited by *Edwards*.

Accordingly, the motion to suppress is GRANTED IN PART with respect to statements made by Daniels during the first interrogation by Sgt. Rosin, from about 3:58 pm to 4:24 pm.

**B. Second Interrogation**

About 25 minutes after Daniels asked for an attorney and Sgt. Rosin terminated the first interrogation, Officer Barocio stepped into the holding cell and asked Daniels, "What's your name? You're John, right?" Doc. no. 164, Ex. 1 at 4:49 pm.

Daniels responded, "Can I ask you a question?" Officer Barocio briefly responded, "Hold on," stepped out, and returned to the holding cell with Sgt. Valle. Sgt. Valle proceeded to engage in conversation with Daniels, having met "a few years ago ... at Santa Rita." Daniels did not remember meeting Sgt. Valle, but stated, "They just booked me for something I didn't even do." Sgt. Valle responded that he came to talk about something else, and proceeded to ask about Operation Cease Fire. He also asked Daniels about his parole status, and about an incident when Daniels was seen running away from a car which was carrying two known individuals and in which a gun was found. Daniels mentioned several times during the course of the conversation with Sgt. Valle that he "didn't do nothing" and that he would get life in prison for something he didn't do, but Sgt. Valle told Daniels that he's "not here to talk about that," and that Daniels should discuss that topic with the investigator.

About six or seven minutes into this conversation, at about 4:56 pm, Daniels told Sgt. Valle,

> I just wanted, whatever y'all want to know, I tell you all just let me talk to my wife. My wife here. The other investigator talked to her.... I want to talk to her. So if you all whatever, if I get to talk to her, if I could talk to her, whatever you all want to know, I'll tell you all. I ain't got nothing to hide. I ain't do shit to nobody....

Sgt. Valle resumed asking Daniels about Operation Cease Fire, and at about 4:58 pm, Daniels again asked to speak to his wife and indicated his willingness to talk about the murder investigation:

> I ain't even do shit, like, whatever you all want me to do, I'll do it. I just want to talk to my wife. Whatever you want to know, I'll tell you. I just want to talk to my wife. Whatever anybody want to

know, I'll tell them. I just want to talk to my wife. I'm not about to get in trouble for something I don't got nothing to do with it, and like I was telling you, I've been telling the same thing. It's not my styl-o.

In further conversation, Daniels mentioned being shot at, repeatedly denied involvement in the murder, and asked again to talk to his wife:

> I just want to talk to my wife. After I talk to my wife, you can send the detectives back in here. I'll tell him what he want to know. I didn't do nothing. They charge me for murder for something I didn't do?

At about 5:12 pm, in response to Officer Valle's clarifying question, "So I just want to make sure that we're clear; so you want me to somehow arrange for you to talk to your wife, and then you want me to call the detective back in here," Daniels answered, "Yes."

Daniels turned to Officer Barocio and asked, "Can I talk to you?" Sgt. Valle left the holding cell, and Daniels told Officer Barocio, "They just charged me with murder." Officer Barocio continued to talk to Daniels until Sgt. Valle returned to the holding cell and Officer Barocio stepped out. Daniels told Sgt. Valle, "You didn't read me my rights." Sgt. Valle responded, "Don't need to. Because I'm not talking about your case." Sgt. Valle left Daniels in the holding cell at about 5:35 pm.

▄ This second interrogation conducted by Sgt. Valle, with Officer Barocio present, was not initiated by Daniels but was initiated by the police. The government's contention that Daniels initiated ·contact with the police by asking, "Can I ask you a question," is not supported by the totality of the circumstances, where Sgt. Valle and Officer Barocio entered the holding cell, introduced themselves, and engaged Daniels in conversation about Operation Cease

Fire and his parole status without determining whether Daniels waived his right to an attorney, which he had invoked less than half an hour before Sgt. Valle and Officer Barocio entered the holding cell. The conversation initiated by Sgt. Valle and Officer Barocio was not merely small talk, as in *Mickey v. Ayers*, 606 F.3d 1223, 1234–35 (9th Cir. 2010), where the court held that an officer engaging in "small talk" for several hours with a suspect while he is transported on an international flight does not constitute interrogation, even if the discussion includes disturbing personal information about the suspect's family known to the officer, where police asked no questions, the suspect initiated the conversation and the casual conversation was not "reasonably likely to elicit an incriminating response." In particular, the questions to Daniels about being on parole when he was seen running away from law enforcement is more like the interrogation at issue in *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), where the suspect was arrested at the scene of a burglary and invoked his right to counsel, then was interrogated by a different officer about a different burglary.

▄ Under *Roberson*, the court need not determine whether a second interrogating officer knows that the suspect requested counsel during an earlier interrogation, or even whether the second interrogation was pretextual, which Daniels contends with respect to Sgt. Valle and Officer Barocio's line of questioning. In recognizing a bright-line rule under *Edwards*, the Court in *Roberson* held, "[w]hether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel ·exists."

486 U.S. at 687–88, 108 S.Ct. 2093. Here the police officers initiated the second interrogation of Daniels after he invoked his right to counsel, and did not re-admonish him before asking him about ostensibly different matters, as was done in *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (no *Miranda* violation where the initial interrogation was terminated once the defendant stated that he did not want to discuss recent robberies, and he was questioned two hours later by another police officer at another location about an unrelated murder after being given full and complete *Miranda* warnings). Under these circumstances, the government has not shown that the police "scrupulously honored" Daniels' right to cut off questioning under *Miranda* after he asserted his right to have counsel present. *Mosley*, 423 U.S. at 104, 96 S.Ct. 321.

The motion to suppress is GRANTED IN PART with respect to statements made by Daniels during the second interrogation by Sgt. Valle and Officer Barocio, which lasted approximately from 4:49 pm to 5:35 pm.

## C. Third Interrogation

The third interval of questioning began at about 6:28 pm, after Daniels spoke to his wife and Sgt. Rosin returned to the holding cell. As noted above, Daniels specifically asked Sgt. Valle to arrange for his wife to visit and then to call the detective (Rosin) to come back. The audio/video recording of Daniels' conversation with Sgt. Valle and Officer Barocio shows that Daniels repeatedly stated his willingness to talk about the murder investigation if he could first talk to his wife. Daniels' wife, Lynae Washington, entered the holding cell about 6:23 pm and spoke to Daniels for about four minutes. When she left the

holding cell with Sgt. Rosin at 6:27 pm, Daniels called out to her, "Can you get a lawyer?"

When Sgt. Rosin entered the holding cell after escorting Ms. Washington out, he asked Daniels, "Sgt. Valle told me you want to talk to me; is that true?" Daniels responded yes, thereby reinitiating communication with Sgt. Rosin. Sgt. Rosin proceeded to read Daniels his *Miranda* rights again, at 6:29 pm, and Daniels stated that he understood his rights and initialed a written form. Daniels responded to Sgt. Rosin's questions about the murder, admitted he was present at the time of the shooting, and identified the shooter.

Daniels moves to suppress his statements made to Sgt. Rosin during the third interrogation, on the ground that the officers were not allowed to speak at all with Daniels without an attorney present once he invoked his right to the presence of counsel. Daniels concedes that he stated "affirmatively that he wanted to resume talking about the murder investigation," but contends that he changed his mind about talking to Sgt. Rosin only as a result of badgering by Sgt. Valle and Officer Barocio. Reply (doc. no. 185) at 8 (citing *Montejo v. Louisiana*, 556 U.S. 778, 789, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009)). Daniels suggests that the reinitiation of communication with Sgt. Rosin was tainted by the improper questioning by Valle and Barocio, which Daniels did not initiate. The totality of the circumstances show, however, that Daniels voluntarily, knowingly and intelligently waived his right to have an attorney present during the third interval of questioning by Sgt. Rosin.

As the Ninth Circuit has recognized, in *Mosley*, "the Supreme Court rejected the proposition that its earlier decision in *Miranda* barred law enforcement officials from ever questioning a suspect after the suspect had invoked his right to remain

silent," in favor of a case-by-case inquiry into all of the relevant facts to determine whether the suspect's rights have been respected. *United States v. Hsu*, 852 F.2d 407, 409–10 (9th Cir. 1988). In *Mosley*, the Supreme Court held that the admission of incriminating statement made after the defendant initially refused to answer questions did not violate *Miranda* where the police gave full "*Miranda* warnings" to the defendant at the very outset of each interrogation, subjected him to only a brief period of initial questioning, and suspended questioning entirely for a significant period, two hours, before beginning the interrogation that led to his incriminating statement. Following *Mosley*, the court in *Hsu* held that the defendant's right to cut off questioning was scrupulously honored where the defendant asserted his right to remain silent during the first interrogation, then answered questions during a second interrogation after being advised again of his *Miranda* rights. The court reasoned that neither the amount of elapsed time between interrogations, which was about 30 minutes, nor the identity of subject matter, were of primary importance in determining whether a suspect's rights were "scrupulously honored" under *Mosley*. Rather, the court in *Hsu* focused on the validity of the second waiver, with the "most important factor" being "fresh warnings" to readvise the suspect of his *Miranda* rights, and inquired into "the actual coercion exerted by police upon a suspect in order to extract information." *Id.* at 410, 411.

In *Hsu*, the court noted that the "crucial factor" to establish a valid waiver after the right to remain silent is initially invoked is "the provision of a fresh set of warnings," *id.* at 411 (citing *United States v. Heldt*, 745 F.2d 1275, 1278 (9th Cir. 1984)), although it is worth noting that there is no per se rule under Ninth Circuit

authority requiring that a suspect be readvised of his rights after the passage of time or changed circumstances. *See United States v. Rodriguez–Preciado*, 399 F.3d 1118, 1130 (9th Cir.), *amended*, 416 F.3d 939 (9th Cir. 2005) (holding that where statements made on the second day of questioning were 16 hours after original *Miranda* warnings, they were sufficiently close in time that no readvisement was required). Here, as in *Hsu*, Daniels was readvised of his rights by Sgt. Rosin, who meticulously re-read Daniels his *Miranda* rights and determined that Daniels waived those rights. Moreover, the session was clearly re-initiated by Daniels' explicit request to talk to Sgt. Rosin. Furthermore, Daniels was given deferential treatment while he was in custody, having been given a smoke break and having his request to leave open the holding cell door honored. "This conduct was the antithesis of coercion or intimidation." *Hsu*, 852 F.2d at 412. In looking to whether Daniels' waiver of *Miranda* rights was knowing and intelligent, the factors for the court to consider weigh in favor of finding valid waiver here: (1) Daniels signed a written waiver; (2) Daniels was advised of his rights in his native tongue; (3) Daniels appeared to understand his rights, having been *Mirandized* twice by Sgt. Rosin and having asked Sgt. Valle earlier why he didn't read Daniels his rights; (4) Daniels did not need the assistance of a translator; (5) Daniels' rights were individually and repeatedly explained to him two separate times by Sgt. Rosin; and (6) Daniels had prior experience with the criminal justice system, was on parole, and demonstrated familiarity with the interrogation process. *Garibay*, 143 F.3d at 538. The totality of the circumstances supports the voluntariness of Daniels' waiver, and demonstrates that the police scrupulously honored Daniels' *Miranda* rights.

Accordingly, the motion to suppress is DENIED IN PART with respect to the statements made by Daniels after he reinitiated contact with Sgt. Rosin and waived his *Miranda* rights, starting at about 6:28 pm and for the duration of his custodial interrogation.

## III. CONCLUSION

For the reasons set forth above, the motion of Daniels to suppress evidence obtained in violation of *Miranda* is GRANTED IN PART AND DENIED IN PART.

**IT IS SO ORDERED.**